**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **ROBERT RIDDELL, et al., individually** ) | |
| **and on behalf of all others similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:20-CV-254-SNLJ** |
| ) | |
| **GENERAL MOTORS LLC,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff Robert Riddell brought this lawsuit on behalf of himself and a putative

class of similarly situated individuals against defendant General Motors LLC ("GM").

Currently pending before the Court are defendant's motions to exclude testimony of

plaintiff's expert witnesses [Doc. 66, Doc. 63], motion for summary judgment [Doc. 71],

and motion to reconsider class certification [Doc. 94]. The motions have been fully

briefed and are ripe for adjudication.

**I.     Factual Background and Procedural History**

Plaintiff Robert Riddell is a Michigan resident who purchased a new 2012

Chevrolet Silverado with a Generation IV 5.3 Liter V8 Vortec 5300 engines (the "Gen IV

engine") in 2012 in Ballwin, Missouri. Plaintiff alleges that Gen IV engines contain

defective piston rings that cause excessive oil consumption. That "Oil Consumption

Defect" allegedly causes reduced engine lubricity, which, in turn, causes engine damage

and malfunction. Plaintiff alleges that GM knew about the defect but failed to disclose it

to the people who bought trucks and SUVs containing the Gen IV 5.3L engines, and GM has refused to offer an effective repair.

Plaintiff's allegations are materially identical to numerous cases filed against GM across the country.  The first of those cases was filed in 2016, *Siqueiros v. General Motors LLC*, No. 16-cv-07244  (N.D. Cal.).[1] That case has proceeded to trial and a verdict for plaintiffs. *Siqueiros*, ECF No. 566 (verdict form).  The plaintiff here explains he brought his claims in this Court rather than in the Northern District of California *Siqueiros* action because GM successfully argued that no additional non-California plaintiffs may assert claims in the *Siqueiros* action pursuant to *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017).

Riddell alleges his vehicle started consuming excess oil after 25,000 to 30,000 miles. He alleges that GM was aware of but failed to disclose the alleged oil consumption defect, citing GM advertisements and public statements that generally refer to the performance, power, and fuel economy of GM's vehicles, as well as technical service bulletins that GM made available to dealerships. Plaintiff alleges he reviewed window stickers affixed to his vehicle and that he viewed TV commercials.  The Class Vehicles came with a 5-year, 100,000 mile New Vehicle Limited Warranty.

Plaintiff's complaint now includes only Count I: violation of the Missouri Merchandising Practices Act ("MMPA"). Plaintiff seeks to represent a class of Missouri purchasers and lessees of certain model year 2011-2014 GM vehicles equipped with Gen

---

[1] Early *Siqueiros* case captions used plaintiff Monteville Sloan's last name as the lead plaintiff, so some captions read *Sloan v. General Motors LLC*.

IV engines ("Class Vehicles"). Plaintiff claims class members suffered unspecified damages because they "would not have purchased" or "paid too much" for their vehicles due to the alleged non-disclosure of the oil consumption defect. He seeks attorneys' fees and costs, restitution, pre- and post-judgment interest, and damages, including punitive damages.

## II.     *Daubert* Motions

Defendant seeks to exclude the testimony of two of plaintiff's proposed experts. To be admissible, Federal Rule of Evidence 702 requires the expert testimony (1) help the trier of fact determine facts at issue; (2) be based on sufficient facts or data; and (3) be the product of reliable principles and methods.  In addition, the expert must have reliably applied those principles and methods to facts of the case.  This Court must act as a "gatekeeper" in determining the admissibility of expert testimony and must "make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and applicable to the case."  *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 896 (8th Cir. 2007); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

### A.     Edward Stockton

Plaintiff proffers Edward Stockton as his damages expert.  Stockton opines that plaintiff and other class vehicle purchasers overpaid by an amount equal to the full retail cost to replace the piston rings.  Defendant moves to exclude Stockton's opinion based on Stockton's assumptions and methodology.  Importantly, defendant fails to even mention that the *Siqueiros* court already rejected these very arguments when it addressed

defendant's motion to exclude Stockton's testimony in the Siqueiros case.  *See Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022). Because this Court agrees with the *Siqueiros* court's analysis, this Court will only briefly discuss defendant's arguments here.

First, defendant contends Stockton's opinions are unsupported and unreliable because they are "based on assumptions, not facts."  [Doc. 67 at 10.]  In particular, defendant complains that Stockton assumes the following, e.g.:  that an alleged defect in all class vehicles exists, that the piston ring defect results in dangerously excessive oil consumption, that the defect impacts prices paid in the same way, and that it can be repaired uniformly for all vehicles for $2,700.  Defendant further complains Stockton "did not review any of the evidence produced in this case; and he did not analyze market data, undertake market research, or conduct studies or surveys to determine whether his assumptions are correct."  [Doc. 67 at 16.]  Defendant's "argument, however, fails to grapple with the fact that Stockton is a *damages expert*, and, thus, is entitled to *assume* liability in order to model the damages."  *Siqueiros*, 2022 WL 74182, at *10 (emphasis in original; collecting cases).  Defendant may challenge Stockton's assumptions, but such challenges go to impeachment, not admissibility.  *See id*. (citing *Alaska Rent-A-Car v. Avis Budget Grp., Inc*., 738 F.3d 960, 969 (9th Cir. 2013)).

Next, defendant attacks Stockton's methodology.  Defendant states Stockton purports to rely on "expected utility," which is a theory that depends directly on an individual purchaser's level of perceived risk and his tolerance for that risk.  Defendant

argues that Stockton could not have correctly applied that theory because he assumed the defected posed a serious safety defect in all vehicles and that all consumers would seek the same fix. Again, however, "GM's argument is premised on its same, incorrect objection to Stockton's *assumptions....*"  *Id.* at *11 (emphasis in original).

Defendant also argues that Stockton impermissibly assumed that the value of the original piston assembly in the Gen IV engine was $0. Again, Stockton's assumptions are subject to cross-examination.  Stockton's figures regarding the cost of repair came directly from defendant's own documents.  This is not a reason to exclude his testimony.

As the *Siqueiros* court already determined, and again assuming independent proof of liability, Stockton's opinion is admissible.  Defendant's motion is denied.

### B.    Werner J.A. Dahm

Plaintiff offers Dr. Werner J.A. Dahm as his technical expert.  His report includes opinions on a wide range of topics, including the root cause of alleged excess oil consumption in Class Vehicles; the potential impact of oil consumption on vehicle operation; the effectiveness of GM's design changes; the veracity and reliability of GM studies and warranty data; the adequacy of oil pressure instruments in Class Vehicles; the driving habits, knowledge, and beliefs of Class Vehicle purchasers and lessees; the purported safety risks posed by the alleged defect; GM's corporate knowledge; the credibility of other witnesses; and his view on an "adequate repair" and what that repair would cost for every Class Vehicle.  Defendant moves to exclude Dr. Dahm's testimony.

Plaintiffs in the *Siqueiros* case offered Dr. Dahm for the same purpose, and the *Siqueiros* court granted in part and denied in part the defendant's motion to exclude his testimony. *Siqueiros*, 2022 WL 74182 at *10. It appears that defendant made largely the same arguments before the *Siqueiros* court, and this Court again agrees with that court's analysis.

## 1. Qualifications

Federal Rule of Evidence 702 state that an expert witness must be qualified to testify as an expert by "knowledge, skill, experience, training, or education" and may only provide opinion testimony if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Dr. Dahm has Master's and Bachelor's degrees in mechanical engineering and a Ph.D. from CalTech's Division of Engineering and Applied Science. He is a Foundation Professor of Mechanical and Aerospace Engineering at Arizona State University, where he teaches courses on internal combustion engines. Defendant characterizes Dr. Dahm as an "aeronautical engineer" and argues that he is not qualified to serve as an expert here because he allegedly has no specialized knowledge, skill, experience, training, or education in the fields of automotive design or human behavior. The *Sisqueiros* court rejected that argument and held Dr. Dahm qualified to testify as an expert.

As the *Sisqueiros* court stated, "the scope of Dr. Dahm's assignment…was to provide his 'independent opinions regarding combustion, lubrication, ring sealing, heat transfer and related aspects of the Gen IV 5.3L Vortec engines in the Class Vehicles, in particular as they relate to oil consumption, engine performance, [and] piston ring wear.'" 2022 WL 74182 at *5 (quoting Dahm's report). Further, it "is undisputed that Dr. Dahm

has extensive training, expertise in and has published widely on the topics of fluid dynamics, combustions, heat transfer and engines." *Id*. The court concluded, "the primary focus of Dr. Dahm's opinions is on the mechanics, design and functioning of a combustion engine, including heat transfer and flow of oil within the engine. These are topics on which Dr. Dahm has demonstrated adequate 'knowledge, skill, experience, training' and 'education' to qualify as an expert." *Id.* at *6 (internal citation omitted). It appears that defendant has cherry-picked facts in an attempt to support its claim that Dr. Dahm is not qualified to testify as an expert here, but defendant has even engaged Dahm to improve the combustion process and performance of its own piston engines. [*See* Doc. 85 at 18.]

Similarly, this Court agrees with the *Siqueiros* court's analysis of Dr. Dahm's qualifications with respect to his opinions relating to "human behavior." As that court concluded, Dr. Dahm "has adequate experience to opine on the interaction between drivers and the alert systems in Class Vehicles." 2022 WL 74182, at *6.

### 2.  Supporting facts and methodology

Dr. Dahm proposes to testify, *inter alia*, that the alleged oil consumption defect is "present," "common," and "precisely the same" in plaintiff's vehicle and all other Class Vehicles, and that the proper repair is a piston ring replacement for $2,700. Defendant argues that these opinions are neither "based on sufficient facts or data" nor "the product of reliable principles and methods" as required by Rule 702.

### a.  Presence of the oil consumption defect

First, defendant contends that Dahm's opinions related to the defect are not supported by facts because Dr. Dahm did not test or even physically handle any Class

Vehicle, Gen IV engine, or Gen IV engine component, did not research the rate at which the oil consumption symptoms occur, and did not speak to the plaintiff or any other Class Vehicle owner.  Instead, Dr. Dahm based his conclusions on his review of evidence produced in the litigation, and through "application of engineering principles related to fluid dynamics, combustion, heat transfer, lubrication, and engine design."  2022 WL 74182 at *7.  However, Dr. Dahm's report does not just opine that piston ring wear is a cause of the oil consumption defect—

> he concludes that ring wear is the *root cause* of the oil consumption defect, that it is present in *all* Class Vehicles, is precisely the same in *all* Class Vehicles, that the oil consumption defect is unaffected by how the vehicle owner drives or maintains their vehicle, and the impacts from the oil consumption defect are occurring in each and every class vehicle regardless of whether the owner is aware of those impacts or not.

*Id.* (emphasis in original). But Dr. Dahm "did not conduct an empirical analysis to assess the frequency with which any impacts of the alleged defect actually occurred in the Class Vehicles," and he "concedes that he cannot conclude what exactly is incorrect or defective about the piston ring design."  *Id.*  This Court agrees with the *Siqueiros* court that defendant's arguments with respect to methodology here are persuasive.  *Id.*  This Court thus "excludes Dr. Dahm's testimony as to the root cause of the oil consumption defect, his opinion that a piston ring design defect is present in *all* Class Vehicles, and his conclusions as to other issues in *all* Class Vehicles as summarized in ¶ 65 of the Dahm Report."  *Id.* at *8 (emphasis in original).

### b. Repair cost

Defendant argues that Dr. Dahm's opinion that the cost to repair the defect is $2,700 should be excluded because Dahm has done nothing to determine the actual cost of such a replacement procedure. Instead, Dahm simply relies on an internal GM document, and he does not know how the figure was calculated nor the actual cost of PVD piston rings. As the *Siqueiros* court concluded, however, this "objection lacks merit because Dr. Dahm does not *opine* on the issue of the cost of repair, but he references the cost of repair that was recited in a document produced by GM providing a cost analysis of the replacement cost of a piston ring." *Id.* at *8 (emphasis in original).

### c. The province of the jury

Finally, defendant argues that Dr. Dahm usurps the role of the jury by selectively quoting the evidence and offering baseless opinions about what the evidence means. For example, defendant contends Dr. Dahm merely summarizes the evidence without offering expert methodology when he (1) calculates an oil consumption rate by applying basic math to information in unspecified owner manuals, (2) posits speculative hypotheticals about safety risk for vehicle occupants, and (3) selectively quotes GM witness testimony and documents to opine on credibility of evidence and GM's state of mind. This Court agrees that summaries of the evidence without application of expertise invade the province of jury and violate Rule 702. As the *Siqueiros* court concluded,

> Dr. Dahm's opinions and testimony are…excluded to the extent that they consist of unadorned restatements or summaries of evidence already in the record. By contrast, Dr. Dahm's opinions which employ his expert knowledge to explain the scientific and engineering principles relevant to the issues in this case, such as his discussion of the purpose of piston rings and their relation to engine operation in general, are permissible under Rule 702.

*Id.* at 10.

### 3.   Conclusion

In conclusion, the Court grants in part and denies in part defendant's motion to exclude Dr. Dahm's opinions.  The Court excludes Dr. Dahm's opinions that (1) a deficiency in the design of the piston rings in Class Vehicles is the root cause of the alleged oil consumption defect, and (2) that the piston ring design defect is present in all Class Vehicles. In addition, "the Court excludes Dr. Dahm's testimony to the extent it summarizes or restates evidence already in the record without applying a reliable methodology to interpret or analyze such evidence."  *Id.*

## III.   Summary Judgment

Defendant's motion for summary judgment [Doc. 71] will be discussed next.

### A.  Legal standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." *Martin v. United Collections Bureau, Inc.*, No. 4:14-CV-804-JAR, 2015 WL 4255405, at *2 (E.D. Mo. July 14, 2015) (citing *Husinga v. Federal–Mogul Ignition Co.,* 519 F.Supp.2d 929, 942 (S.D. Iowa 2007)). "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager v. Cormorant Township Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983). In determining the appropriateness of summary judgment, "the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Bingaman v. Kansas City Power & Light Co.,* 1 F.3d 976, 980 (10th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251–52)).

**B.  Discussion**

Defendant argues that it is entitled to summary judgment on plaintiff's claims because there is no evidence of a ring defect in plaintiff's vehicle, because plaintiff's MMPA claim is time-barred, and because plaintiff does not have sufficient evidence on essential elements of his MMPA claim.  Each of these arguments is discussed in turn below.

**1.  Ring defect**

The MMPA states that the use of any omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce constitutes an unlawful act.  *Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 701 (E.D. Mo. 2018) (quotation omitted).  Plaintiff claims that defendant concealed the oil consumption defect and its cause in violation of the MMPA.  Defendant's motion here argues that plaintiff cannot prove any such defect exists.

This Court addressed this issue in its memorandum and order on plaintiff's motion for class certification [Doc. 93 at 8-9].  Although this Court has limited plaintiff's expert testimony on this matter, the "[e]xistence of a defect may be inferred from circumstantial evidence and common experience; expert testimony is not required." *Pitman v. Ameristep Corp.*, 208 F. Supp. 3d 1053, 1060 (E.D. Mo. 2016).  Indeed, defendant's documents and engineers' testimony supports the conclusion that class vehicles suffer from the oil consumption defect due to excessive piston ring wear.  Defendant is not entitled to summary judgment on this issue.

## 2.  Statute of limitations

Defendant argues that plaintiff's claim is barred by the five-year statute of limitations.  § 516.120(2) RSMo (five years for "an action upon a liability created by a statute") and § 516.120(5) RSMo  (five years for an "action for relief on the ground of fraud").  Plaintiff purchased his vehicle in September 2012, and he alleges he noticed low oil levels shortly after his purchase, but plaintiff did not file his complaint until November 24, 2020—more than eight years after his purchase and thus well after the five-year statute of limitations would have run.

Under Section 516.120(5), the five-year statute begins to run upon "discovery of the facts constituting the fraud or when the fraud would have been discovered by the exercise of due diligence." *Huffman v. Credit Union of Tex*., 758 F.3d 963, 969 (8th Cir. 2014) (quoting *Creative Mktg. Assoc., Inc. v. AT&T*, 476 F.3d 539, 539 (8th Cir. 2007) (emphasis removed)).  Here, defendant has not shown that plaintiff was aware of the facts constituting defendant's fraud, nor that he could have discovered defendant's fraud, before November 24, 2015.  Defendant only argues that plaintiff noticed low oil levels shortly after his purchase, not that plaintiff could have known GM was knowingly selling vehicles with an oil consumption defect.  In fact, GM continues to deny the oil consumption defect exists.

As for Section 516.120(2), accrual of a cause of action under that section is governed by § 516.100 RSMo. *Huffman*, 758 F.3d at 967.  Under § 516.100, "the statute of limitations begins to run when the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury." *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d at 582 (Mo. *banc* 2006). Defendant provides no evidence

to support that plaintiff could have discovered the oil consumption defect prior to November 24, 2015. Even if plaintiff had noticed what he believed to be excessive oil consumption prior to this date, this does not mean that plaintiff could have known that he had a potential claim against defendant for knowingly selling him a defective vehicle. *See Sloan v. General Motors, Inc.*, 2020 WL 1955643, at *19 (N.D. Cal. Apr. 23, 2020). In fact, the *Siqueiros* court addressed a similar argument and held that although "Mr. Siqueiros did have oil consumption problems with his vehicle that emerged more than four years before his complaint was filed (and then persisted) . . . . whether Mr. Siqueiros was on inquiry notice before 2016 cannot be decided as a matter of law on summary judgment." *Id.*

Although defendant contends plaintiff did nothing to investigate his potential claim for years, there is at least a question of fact surrounding this matter. Plaintiff testified that he discovered his vehicle was low on oil in between oil changes when his odometer read approximately 25,000 miles.  He states that, afterwards, he repeatedly raised the issue of oil consumption with his dealership's service department, but that his concerns were repeatedly dismissed.  At one point, the dealer "put the onus on [plaintiff] to bring [the vehicle] in frequently so they could check the oil," and plaintiff "thought that was pretty excessive and strange when they could see themselves between oil changes it was a half quart low." [Doc. 82-1, Riddell Dep. at 104.]  Plaintiff argues that he was not aware of the oil consumption defect or that he had any legal claim for being sold a defective vehicle until he saw an article online about another litigation involving the oil consumption defect.   Defendant has failed to meet its burden of showing

plaintiff's claim is barred by either statute of limitations, and summary judgment is denied on this point.

### 3.  MMPA elements

To state a claim under the MMPA, plaintiffs must show they (1) purchased merchandise from defendant; (2) for personal, family or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the MMPA.  *See Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022).   Because plaintiff's claim is based on an alleged omission, plaintiff must also prove the omitted facts are material, that defendant knew of those facts at the time of plaintiff's purchase, and that defendant purposefully omitted the fact in its representations to class members. *See Johnsen v. Honeywell Int'l Inc*., 2016 WL1242545, at *3 (E.D. Mo. March 29, 2016).  Defendant argues that plaintiff cannot show sufficient evidence to support these claims.

First, defendant states plaintiff cannot prove that his loss was proximately caused by defendant's failure to disclose the alleged piston ring defect because plaintiff cannot prove that (1) his vehicle's piston rings are defective, (2) his vehicle consumed excess oil or otherwise malfunctioned because of that defect, and (3) he would not have bought his vehicle if he had known about the piston ring defect.  This Court has already determined that plaintiff withstands summary judgment on whether plaintiff's vehicle is defective and whether it malfunctioned because of that defect.  Additionally, plaintiff has provided testimony that he would not have bought his vehicle had he known about the defect.

Next, defendant argues plaintiff has not established a duty to disclose, which, defendant insists, arises only under certain circumstances such as a fiduciary relationship,

privity of contract, or superior knowledge where the parties are dealing directly with each other. [Doc. 72 at 30 (citing *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999))]. None of defendant's cases support that such a common law "duty to disclose" is required under the MMPA. The *Briehl* case did not involve an MMPA claim. *Id.* Notably, the Eighth Circuit opinion that reversed and remanded this matter to this Court discusses the elements of an MMPA claim at length and does not address the special circumstances defendant seeks to require here. *Tucker v. Gen. Motors LLC*, 58 F.4th 392, 397-99 (8th Cir. 2023)

As for defendant's related suggestion that plaintiff cannot maintain his MMPA claim because he did not buy his vehicle directly from defendant, the MMPA's "plain language does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts have not imposed such a requirement through statutory construction." *Gibbons v. J. Nuckolls, Inc.*, 215 S.W.3d 667, 669 (Mo. *banc* 2007) (quoted in *Tucker v. Ethicon, Inc.*, No. 4:20-CV-1543 RLW, 2021 WL 410058, at *8 (E.D. Mo. Feb. 5, 2021); *see also Tucker*, 58 F.4th at 399 (concluding that plaintiff stated a claim that "GM violated the MMPA when it failed to disclose a material fact -- the oil consumption defect -- when selling each of them an affected vehicle.").

Finally, defendant argues that plaintiff has no evidence that defendant knew of any piston ring defect that would cause excess oil consumption in plaintiff's 2012 Chevrolet Silverado when he bought it in 2012. In support, defendant points out that it implemented a series of design changes that reduced oil consumption claims as of vehicles manufactured after February 10, 2011. Those design changes began after

defendant's "Red-X team" investigation that was commissioned to identify the root cause of oil consumptions in certain 2007-model year LC9 aluminum block Gen IV engines. The changes include the following:

- At the start of model year 2010 production, GM changed from '251 piston ring material to more durable '278 piston ring material.

- On October 21, 2010, GM added a metal "umbrella shield" to the AFM oil pressure relief valve in the crankcase.  This eliminated oil spray onto the pistons and cylinder walls where it could be pulled up into the combustion chamber and consumed.

- On February 11, 2011, GM added a redesigned valve cover, which relocated certain inlets and drains to more effectively separate oil particles from gases pulled from the crankcase.  This change was intended to reduce the likelihood that oil could be vacuumed into the combustion chamber and consumed.

Plaintiff limits his class to vehicles manufactured on or after February 11, 2011. Although plaintiff claims those design changes were ineffective, plaintiff must show that GM knew its design changes would not be effective at the time of sale to maintain his claim for fraud under the MMPA.  To do so, plaintiff relies on testimony and internal GM documents from 2012 through 2015 that acknowledge continued problems with oil consumption and piston rings [*see* Doc. 81 ¶ 59].  However, even considering plaintiff's supporting documents in the light most favorable to plaintiff, there does appear to be a period of time during which defendant did not yet know its 2010 and 2011 remedies had not been entirely successful.

Plaintiff claims in his response to defendant's statement of undisputed facts that "there is overwhelming evidence that GM knew that each of its countermeasure were band-aid repairs and that '251 and '278 piston ring failure was the root cause of the oil consumption defect." [Doc. 81 ¶ 49.]  This Court disagrees that the evidence is "overwhelming."  Indeed, plaintiff has no evidence to show that GM knew its design changes would not be effective when it employed the 2010 and 2011 fixes. The record includes the following:

- GM engineers' emails from October 2012 "confirmed…that GM continued to receive oil consumption warranty claims 'on vehicle[s] built after the improvements' and that GM 'confirm[ed] the new valve cover baffle does not completely kill'" the oil consumption issues. [Doc. 81 at ¶ 59 (citation omitted).]

- GM engineer's communication to piston ring supplier dated October 2013 stated that GM was "still getting Gen IV LC9 engines returned due to poor oil consumption." [*Id.*]  The email also stated that GM wanted "to give customers a better chance of it really being fixed after a warranty rebuild." [*Id.*]

- GM engineers' communication dated July 2014 states that "We would love to see a move for service rings.  We continue to see alum[inum] blocks up through 2013 with oil consumption." [*Id.*]

It thus appears that the October 2012 emails are plaintiff's first evidence showing that defendant knew the Gen IV engines were the continued subject of "oil consumption warranty claims 'on vehicle[s] built after the improvements.'" [Doc. 81 ¶ 59 (quoting

Doc. 82-16).]  This Court agrees that plaintiff has not produced evidence to show that defendant knew about the continued oil consumption defect in Class Vehicles after the design changes and before, at the earliest, October 2012.  Only then would there be a resulting need to disclose to potential purchasers.

This Court holds then that defendant is entitled to summary judgment on claims related to vehicles purchased before October 2012.  Notably, plaintiff Riddell purchased his truck in September 2012. As a result, the lead plaintiff's claims fail, and it appears that Mr. Riddell is no longer a suitable class representative. This Court will thus decertify the class and require additional briefing on the matter of the class representative and the viability of this case in general given the reduced class size.

## IV.    Motion to Reconsider Class Certification

First, however, the Court will address the defendant's motion to reconsider this Court's class certification.  Defendant makes four arguments in support of its motion.

### A.    Article III Standing

Defendant argued in its original opposition memorandum that plaintiff cannot establish standing for his proposed class as required by Article III of the United States Constitution. Notably, this is an argument that the *Siqueiros* court addressed and rejected multiple times. *See Siqueiros v. General Motors LLC*, 676 F. Supp. 3d 776 (N.D. Cal. 2023).  Defendant argues that this case is different because it is subject to Eighth Circuit law, which defendant characterizes as requiring that "class members claiming overpayment or economic loss injuries for unmaterialized risks of harm do not meet Article III standing requirements and cannot be certified." [Doc. 95 at 10.]  Defendant contends that the class definition necessarily includes class vehicles that do not

19

excessively consume oil and therefore those plaintiffs do not have standing.  In its Order, this Court recognized that "it is not enough to allege that a product line contains a defect or . . . is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." *Johannessohn v. Polaris Indus., Inc.,* 9 F.4th 981, 987-88 (8th Cir. 2021) (quotation omitted; cleaned up).

This Court concluded that Eighth Circuit law does not require a different result from the *Siqueiros* case:

> The oil consumption at issue in this case results from "inherent, premature piston ring wear" [Doc. 83 at 16], and plaintiffs contend—with support from defendant's documents—that the defect exists in all class engines.  This is distinguishable from the facts in *Johannessohn*, in which the problem of a too-hot engine manifested only under certain conditions for certain vehicles. Not all ATVs in *Johannessohn* had plastic panels close enough to the exhaust to melt, but plaintiffs here say that all class engines suffer the same defect whereby normal engine operation causes excessively worn piston rings.  As the *Siqueiros* court held, "the law is clear that 'overpayment is a viable theory of economic injury' and that plaintiffs can satisfy the injury in fact requirement by showing that the defect caused them to overpay for their vehicles." 676 F. Supp. 3d at 825.   This is a much different theory of liability and damages than that in *Johannesohn*, in which actual manifestation of the defect was required.

[Doc. 93 at 7 (placement of quotation marks and citation corrected from original).]

Defendant complains that, although this Court may have distinguished *Johannesohn*'s facts from the facts of this case, this Court did not distinguish either *O'Neil v. Simplicity, Inc.,* 574 F.3d 501 (8th Cir. 2009) or *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999).  Both *O'Neil* and *Briehl* are breach of warranty cases, and neither discussed Article III standing.  The *O'Neil* plaintiffs purchased a drop-side crib that had been recalled because "a hardware defect…made it possible for the drop-side to detach from the crib, creating a dangerous gap in which a child could get caught."  574 F.3d at

502.  The problem had caused three infant deaths.  *Id.*  The plaintiffs excluded from their class any customers who experienced injuries, and they admitted that their cribs had not malfunctioned.  Nor had the plaintiffs sought, received, and installed the defendant's repair kit, which would render the drop-side inoperable.   The plaintiffs did not want to use the crib because of the safety concern, so they said that they had not received what they paid for: a crib with a functional drop-side. *Id.* at 504.  The court, relying on *Briehl*, affirmed dismissal:  "The O'Neils' crib performs just as it was intended, and thus there is no injury and no basis for relief."  574 F.3d at 505.

The *Briehl* plaintiffs sought to represent a class of GM vehicle owners alleging that they were entitled to damages because their vehicles suffered from defects with antilock braking systems.  172 F.3d at 625.  However, the plaintiffs' vehicles were not actually defective: their "brakes have functioned satisfactorily and at no time have the brakes exhibited a defect." *Id.* at 627.

Here, unlike in *Briehl* and *O'Neil*, and as discussed in this Court's earlier order, plaintiff has evidence from defendant's own records that the class vehicles all suffer from the same piston ring defect.  In this way, plaintiff explains, his case is more like that of plaintiffs who had standing in *In re Zurn Pex Plumbing Products Liability Litigation*. 644 F.3d 604, 616-17 & n.6 (8th Cir. 2011). Plaintiffs there had installed plumbing systems that allegedly were "doomed to leak within warranty" because of "stress corrosion cracking" that began at the time of installation. *Id.* at 609. The Eighth Circuit held that the plaintiffs whose pipes had not yet leaked still had standing because they alleged, with evidentiary support, that the cracking was "already manifest in all systems." *Id.* at 617. Another Eighth Circuit case discussing products liability for overheating ATVs noted that

the *Zurn* court "distinguished that claim from hypothetical assertions that the pipes merely 'risk[ed]' developing cracking." *In re Polaris Mktg., Sales Pracs., & Prod. Liab. Litig.*, 9 F.4th 793, 796 (8th Cir. 2021) (internal quotations to *In re Zurn*, 644 F.3d at 617, omitted). The *Polaris* court concluded its plaintiffs did not have standing, in contrast, because they alleged only that their products were "at risk for manifesting a defect." 9 F.4th at 797.

This Court declines to reconsider its order on this matter.

## B.    Ascertainability

Next, defendant re-argues that this Court should reconsider class certification because the class is not ascertainable. In particular, defendant contends that the MMPA requires plaintiffs to have purchased a produce "primarily for personal, family or household purposes," § 407.025 RSMo, and that such a subjective purchase intent is not subject to common proof. As this Court acknowledged in its Order, "Although [intended use] is an individual issue, it does not predominate over the matter's common issues. Indeed, if that were the case, then class actions under consumer protection statutes with such a requirement would be impossible." [Doc. 93 at 11 (citing *Yazzie v. Gurley Motor Co.*, No. CIV 14-555 JAP/SCY, 2015 WL 10818834, at *5 (D.N.M. Oct. 30, 2015)).] The Supreme Court held in *Tyson Foods, Inc. v. Bouphakeo* that

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.

577 U.S. 442, 453-54 (2016) (internal quotations omitted; cleaned up). As this Court already determined, class members may be required to attest that they purchased their

22

vehicle for personal, family, or household use.  They can submit supporting documentation.  Defendant can challenge any attestations it deems concerning. Although this may constitute an individual question, individual questions do not predominate in this case, and the class was properly certified.

### C.    Due Diligence

Defendant's next argument is that this Court erred in finding that plaintiff can establish a duty to disclose and class member due diligence on a classwide basis. Defendant relies on *In re: General Motors Corp. Anti-Lock Brake Products Liability Litigation*, which observes that a "claim for fraudulent omission which alleges one party withheld information based on superior knowledge requires the plaintiff to show that he exercised due diligence to discover the information."  966 F. Supp. at 1536.  In particular, defendant argues that plaintiff has not presented any evidence on the diligence of each class member and that there is no basis to assume that diligent inquiry would not have led some class members to discover the alleged defect.  [Doc. 98 at 8.]  Although defendant acknowledges that that this Court stated that GM "does not seriously suggest that any class member could have known about the oil consumption defect prior to purchase," defendant argues such lack of knowledge does not excuse what it calls a "separate requirement" that each class member demonstrate due diligence.

Notably, when the Eighth Circuit reversed this Court's dismissal of plaintiff's MMPA claim, it discussed the elements of plaintiff's MMPA claim at length.  *Tucker*, 58 F.4th at 396-98.  The elements addressed by the Eighth Circuit in *Tucker* are different from fraudulent concealment elements addressed by that court in the *Anti-Lock Brake* case.  *Tucker's* elements for an MMPA omission claim are (1) the omission of a material

fact, (2) that the material fact is known to defendant, or upon reasonable inquiry would be known to him/her, and (3) the omitted material fact "must be a fact which a reasonable consumer would likely consider to be important in making a purchasing decision." 58 F.4th at 397-98 (internal quotations omitted).  Rather than discuss whether plaintiffs had alleged due diligence on their part, the Eighth Circuit discussed the allegations regarding defendant's knowledge and the allegations that "show that each [plaintiff] was a 'reasonable consumer…making a purchasing decision." *Id*. at 398.  Further, the Eighth Circuit added,

> Because the alleged oil consumption defect concerned the inner workings of a complex machine that the average consumer would be unlikely to know or be able to research, we conclude these allegations are sufficient to plausibly plead this element of Plaintiffs' MMPA omission claims.

*Id.*  This Court declines to reconsider its ruling on this matter.

### D.   Duty to Disclose Based on Special Relationship

Finally, defendant argues that Missouri law requires "superior knowledge gives rise to a duty to disclose only where there is a pre-sale relationship between the parties." [Doc. 95 at 18.]  This argument was addressed above with respect to defendant's summary judgment motion at Section III.B.3.

## V.   Conclusion

In conclusion, this Court will deny defendant's motion to exclude the testimony of Edward Stockton.  This Court will grant in part and deny in part defendant's motion to exclude Dr. Dahm's opinions and the motion for summary judgment, as explained herein. Because it now appears that plaintiff Riddell is not a suitable class representative, this

Court must decertify the class.  Because the class is decertified for reasons not relevant to defendant's motion to reconsider class certification, that motion is denied.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to exclude the testimony of Edward Stockton [Doc. 66] is DENIED.

**IT IS FURTHER ORDERED** that defendant's motion to exclude the testimony of Dr. Werner Dahm [Doc. 63] is GRANTED in part and DENIED in part, as explained herein.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [Doc. 71] is GRANTED in part and DENIED in part, as explained here.

**IT IS FURTHER ORDERED** that the class is DECERTIFIED, as explained herein.

**IT IS FURTHER ORDERED** that defendant's motion to reconsider class certification [Doc. 94] is DENIED.

**IT IS FINALLY ORDERED** that the plaintiff shall file briefing addressing this Court's concerns about the suitability of the class representative, the viability of this case given the reduction in class size, and any proposal for a renewed motion for class certification.  Plaintiff's brief is due June 10, 2024.  Defendant may file a response by June 24, 2024.  Plaintiff may file a reply by July 3, 2024.  The trial date set for July 2024 is hereby VACATED, and the parties should include in their briefing a new proposal for a trial schedule.

Dated this  9th  day of May, 2024.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE